# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Daniel L. Carnes, Sr.,                                                 Case No. 3:16CV1860

         Plaintiff

         v.                                                      **ORDER**

Lima City Schools, et al.,

         Defendants

This is an employment-discrimination case.

Plaintiff Daniel Carnes worked as a custodian for the defendant Lima City Schools from 1985 until he retired in November, 2015.

One year before his retirement, Carnes made delusional statements about a supposed "best friend" relationship he had with a teacher. When Superintendent Jill Ackerman met with Carnes to discuss the incident, Carnes's behavior so alarmed Ackerman that she determined Carnes posed a threat to school safety. Ackerman therefore referred Carnes to the school behaviorist, placed him on leave until he until he obtained a fit-for-duty slip, and ordered him not to enter school property. Carnes never obtained the fit-for-duty slip, however. Instead, and while still on leave, he retired.

Carnes now alleges that the school district placed him on leave because it regarded him as disabled, in violation of Ohio law, and in retaliation for alleging that the teacher had sexually harassed him, in violation of state law and the First Amendment. He also alleges that the school district deprived him of his protected liberty and property interests without due process of law.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Pending is the school district's motion for summary judgment. (Doc. 52). For the following reasons, I grant the motion.

## Background

### A. Delusional Statements

On October 24, 2014, Superintendent Ackerman received a phone call from Angela Heffner, the principal of Liberty Arts Magnet School. (Doc. 26 at 14). Heffner explained that, on the previous day, Carnes told her that the school's first grade teacher "was his best friend," that Carnes "wanted to put her children in his will," and that Carnes believed the teacher's husband did not like him. (*Id.* at 15). Carnes also told Heffner that he had tried to visit the teacher's house, but "she had given him the wrong address." (*Id.*).

When Carnes reported to work later that day, Ackerman met with him, his union representative, and Tim Haller, Carnes's supervisor. (*Id.* at 15, 17). She questioned Carnes about his relationship with the teacher, and Carnes responded that "they were best friends and that they had been best friends for over five years." (*Id.* at 17). Carnes also explained that "he was in charge of making sure that her children were safe when she was out of town." (*Id.*).

Ackerman suggested that this relationship might be inappropriate, and Carnes demanded to know what Ackerman was going to do about it. He alleged that the teacher "had been rubbing on his legs . . . rubbing her hair against his face and whispering in his ear that she wanted to give him alcohol." (*Id.* at 17–18).

At that point, Ackerman told Carnes that she was "very concerned about his mental state" and that she wanted him to see a behaviorist who worked in the "health clinic in [the Lima] high

2

school[.]" (*Id.* at 18). She explained that she was placing Carnes on paid leave, and that he could not return to work before he obtained a "Fit for Duty slip" from a mental health professional. (*Id.*). This upset Carnes, who said "he was going to file with the EEOC, with the Supreme Court, and the President of the United States." (*Id.*).

Haller shared Ackerman's concern for Carnes's state of mind. He testified that, "[w]ith [Carnes's] erratical [*sic*] behavior, we felt that not only he may be a threat to [the first-grade teacher] but he may be a threat to the students and quite frankly maybe himself." (Doc. 27 at 16).

After the meeting, Ackerman sent Carnes a letter reiterating that she had placed him on paid leave so he could "resolve current health issues that [she] believe[d] are impeding [his] ability to perform [his] assigned duties in a safe manner." (Doc. 25 at 134). Ackerman also noted that she had made an appointment for Carnes to see a psychologist, Fred Ferri. (*Id.*). Her letter concluded by instructing Carnes to "remain off of all Lima City Schools property" until the school district had received Dr. Ferri's report and "ma[d]e a determination on [Carnes's] leave status." (*Id.*).

**B. Investigations**

Superintendent Ackerman and Principal Haller investigated Carnes's sexual-harassment allegations. (Doc. 27 at 14–15).

Rather than turning up evidence to corroborate his claims, however, Haller and Ackerman discovered that the teacher "felt uncomfortable with Daniel" because he "was spending a lot of time in her classroom." (*Id.* at 15). The teacher reported that, when Carnes "began asking for her address in the spring of 2014," she gave him the wrong address. Carnes tried to visit that address, and became "visibly upset" when he learned it was not the teacher's residence. (Doc. 26 at 46).

3

On October 31, 2014, the teacher obtained an order of protection against Carnes from the Common Pleas Court of Allen County, Ohio. (Doc. 25 at 137–41). The order, which the court served on the school district, forbade Carnes to have any contact with the teacher or her three children. It also barred Carnes from entering the teacher's residence, her place of employment, and the school that her children attended.

Meanwhile, Monica Clark, the school district's behaviorist and mental-health specialist, met with Carnes on October 27, 2014. (Doc. 26 at 22). Based on her evaluation of Carnes, she determined that Carnes "was a threat to himself, possibly others" and asked that "he not return to Lima Senior High School because of the threat of safety for the students." (*Id.* at 24). She reported her concerns to the Lima Police Department (*id.* at 56) and to Ackerman, who, in turn, warned the teacher about Carnes. (*Id.* at 24).

Carnes met with Dr. Ferri on November 2. (Doc. 25 at 134). Carnes told Ferri that: 1) he hears "voices 'on the inside'"; 2) the voices are "clear as a bell"; and 3) the voices come to him "from . . . [the first grade teacher]." (Doc. 30–2 at 4). Carnes sometimes saw images in his head of the teacher "and her husband going to bed at night and they were both naked." (*Id.* at 9). According to Carnes, he knew that the teacher's husband "gets drunk . . . 'every night, I know' because the man admits it to him and he also sees it." (*Id.*). Carnes also saw visions of the teacher's husband raping her. (*Id.* at 12).

Dr. Ferri concluded that Carnes had "a significant delusional disorder" that was "specifically encapsulated in the firmly held belief that he and the teacher have a loving relationship[.]" (*Id.* at 18). He recommended that Carnes see a psychiatrist and psychologist for at least three to six months of treatment. (*Id.* at 20). Ferri opined that Carnes should "not return to work at the present time." (*Id.*).

4

### C. EEOC Charge

Carnes filed a charge with the EEOC on November 4, 2014. (Doc. 8–1 at 2). He alleged that another custodian working for the school district, Rita Johns, harassed him "because of my sex," in violation of Title VII. (*Id.*).

According to Carnes, Johns was "terrible," loud, and vulgar. (*Id.* at 29). On two occasions – one in late July, 2014, and another in early August, 2014 – Johns had two "altercations" with Carnes. Carnes reported these incidents to Ackerman, and Ackerman suspended Johns for three days without pay and forbade her to have verbal contact with Carnes. (Doc. 26 at 8–10, 44). Thereafter, Carnes testified, his relationship with Johns improved. (Doc. 25 at 43–44).

The agency dismissed Carnes's charge on December 4, 2014. (Doc. 8–2 at 2).

### D. Carnes's Continued Leave and Retirement

In early November, Ackerman tried to meet with Carnes to discuss the school's investigation into his harassment allegations, the expiration of his paid administrative leave, and his possible placement on sick leave pending his obtaining a fitness-for-duty slip. (Doc. 25 at 142–43; Doc. 26 at 26). However, Carnes refused to attend the meeting. (Doc. 26 at 27).

In light of Dr. Ferri's evaluation, Ackerman determined that Carnes was not fit to return to work. (Doc. 25 at 144). She placed Carnes on paid sick leave and advised him that, when his sick leave expired, Carnes would enter unpaid-leave status. (*Id.*). Ackerman concluded by noting that Carnes could also take leave under the Family and Medical Leave Act "until that is exhausted," and that Carnes could "return to work once a Fitness for Duty is approved by a doctor." (*Id.*).

It is undisputed that Carnes never obtained a fit-for-duty release by any doctor or mental-health professional. (Doc. 25 at 109).

5

In December, 2014, Carnes asked the school district to place him on unpaid leave for one year; the school district granted the request. (Doc. 25 at 145, 147). While on unpaid leave, in November, 2015, Carnes retired. (*Id.* at 11).

**Standard of Review**

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

**Discussion**

**A. State-Law Claims**

**1. Disability Discrimination**

Carnes first alleges that the school district failed to accommodate his, discriminated against him on the basis of a, perceived disability. (Doc. 14 at ¶¶5–10). He contends that the school district placed him on an indefinite leave because it believed he suffered from "major depressive disorder, a delusional disorder, stress and situational anxiety and schizophrenia." (*Id.* at ¶7).

Ohio law makes it unlawful for an employer, "because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment[.]" O.R.C. § 4112.02(A).

To make out a prima facie case of disability discrimination, the plaintiff must show that: 1) he had a disability; 2) the employer took an adverse employment action, at least in part, because the plaintiff was disabled; and 3) the plaintiff, despite having a disability, could safely and substantially perform the essential functions of the job at issue. *Wallace v. Mantych Metalworking*, 189 Ohio App. 3d 25, 33 (2010).

If the plaintiff establishes a prima facie case, the defendant must identify a legitimate, non-discriminatory reason for the adverse employment action. *Hood v. Diamond Products, Inc.*, 74 Ohio St. 3d 298, 302 (1996). Finally, if the defendant carries its burden, the plaintiff must show that the "stated reason was a pretext for impermissible discrimination." *Id.*

No reasonable jury could find for Carnes, because the undisputed evidence establishes that: 1) he could not perform his job duties safely and without posing a danger to teachers and students; and 2) the school's basis for placing him on leave – his severe mental health problems – was pretext for unlawful discrimination.

Based on Carnes's delusional statements regarding his relationship with the first-grade teacher, principal Heffner and superintendent Ackerman developed serious concerns about Carnes's mental health. (Doc. 26 at 14–15, 17–18). (Carnes's supervisor, Haller, shared these concerns after meeting with Carnes on October 24, 2015. (Doc. 27 at 16)). When Ackerman and Haller asked the teacher for an account of her interactions with Carnes, the teacher confirmed that Carnes made her

7

feel uncomfortable because he spent an inordinate amount of time around her and had tried to visit her home. (Doc. 26 at 46; Doc. 27 at 14–15).

Two mental-health professionals who later evaluated Carnes confirmed that, due to his mental-health issues, Carnes was not fit for duty. (Doc. 26 at 22, 24; Doc. 30–2 at 18, 20). One of those professionals, Dr. Ferri – to whom Carnes admitted that he heard the teacher's voice in his head and saw images of her husband raping her – concluded Carnes needed at least three to six months of psychological and psychiatric treatment before he could return to work. (Doc. 30–2 at 4, 9, 12, 20).

But there is no evidence Carnes ever obtained the kind of treatment that Dr. Ferri recommended, and it is undisputed that he never obtained a fit-for-duty slip. (Doc. 25 at 109). Indeed, Carnes refused to meet with Ackerman in early November, after his meeting with Ferri, when she had hoped to discuss his mental health and his possible return to work. (Doc. 26 at 26–27).

On top of all this, the Common Pleas Court of Allen County, Ohio, issued an order of protection to the teacher that barred Carnes from having any contact with her and entering her workplace. (Doc. 25 at 137–41).

Because the undisputed evidence establishes that Carnes could not safely work at the Lima City Schools, no reasonable jury could find that he was otherwise qualified for his job. *E.g.*, *Ohio Civil Rights Comm'n v. Case W. Reserve Univ.*, 76 Ohio St. 3d 168, 175–77 (1996).

Likewise, no reasonable jury could find that the school district's stated reason for placing Carnes on leave – the concerns emanating from his mental-health issues – was pretextual. That was a legitimate, non-discriminatory reason for placing Carnes on leave. *See Vazmina v. Donahoe*, 2012 WL 1068791, *8 (N.D. Ohio) ("The fact that a disability poses a direct threat to the health or safety

8

of other individuals in the workplace is a defense to a disability discrimination claims."). And that reason has an ample and, indeed, uncontradicted basis in the record.[1]

For these reasons, Carnes's disability-discrimination claim fails as a matter of law.

## 2. Retaliation

Carnes next alleges that the school district placed him on leave and required him to see Dr. Ferri in retaliation for: 1) alleging the first-grade teacher sexually harassed him; and 2) filing an EEOC charge alleging sex discrimination. (Doc. 14 at ¶¶11–14; Doc. 28 at 7).

To state a retaliation claim under Ohio law, Carnes must establish that: 1) he engaged in a protected labor activity under Ohio or federal law; 2) the school district knew he engaged in protected activity; 3) the district took an adverse employment action against him; and 4) a causal connection existed between the protected activity and the adverse action. *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016).

If Carnes carries that burden, the school district must articulate a legitimate, non-retaliatory reason for the adverse action. *Id.* It then becomes Carnes's burden to demonstrate that the proffered reason was a pretext for retaliation. *Id.*

Even if Carnes has made out a prima facie case, he has introduced no evidence that would permit a jury to find that the school district's reasons for acting were pretextual. Administrators

---

[1] The parties briefed the case on the assumption that it involves indirect evidence of discrimination, but it seems more appropriate to view the case as involving direct evidence. That is, it is undisputed the school district acted because of Carnes's alleged disability: his severe mental-health problems. So viewed, there would be no need to employ the *McDonnell-Douglas* framework to generate an inference of unlawful discrimination. *See Cavins v. S & B Health Care, Inc.*, 2015-Ohio-4119, ¶76 (Ohio App.). Regardless of whether this is an indirect-evidence or direct-evidence case, Carnes cannot prevail because both methods of proof require him to show that he was otherwise qualified for his position. *Id.*

9

developed concerns about Carnes's mental health after speaking to him about his alleged relationship with a teacher, and mental-health professionals confirmed that Carnes's state of mind made him unfit for work. Carnes's behavior was so troubling that a state court issued an order of protection against him.

Because there is no basis for a rational jury to find that these reasons were pretexts for unlawful retaliation, the school district is entitled to summary judgment on the retaliation claim.

### B. Section 1983 Claims

Finally, Carnes brings two claims under 42 U.S.C. § 1983. He contends that the school district deprived him of a protected property interest (his continued employment) and a protected liberty interest (his good name) without due process. He also alleges that the district retaliated against him for making constitutionally protected complaints about sexual harassment and sex-based discrimination.

### 1. Procedural Due Process

To state a claim under § 1983, a plaintiff must establish "(1) the deprivation of a right secured by the Constitution and (2) [the] deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

"[T]o establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).

### a. Property Interest

"For a public employee with a property interest in continued employment, due process includes a pre-termination opportunity to respond, coupled with post-termination administrative procedures." *Silberstein v. City of Dayton*, 440 F.3d 306, 315 (6th Cir. 2006). "Pre-termination hearings need not be elaborate. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004).

It is undisputed that Carnes had a protected property interest in his continued employment by virtue of a collective bargaining agreement that existed between the parties. (Doc. 14 at ¶18). But the undisputed evidence also establishes that Carnes received all the process he was due.

After becoming aware of Carnes's delusional statements, Ackerman met with Carnes and his union representative, advised him of her concerns, and gave him a chance to explain the situation. (Doc. 26 at 14–17). Only after Carnes's responses and behavior during that interview amplified her concerns did Ackerman decide to place Carnes on paid leave, pending his obtaining a fit-for-duty slip.

After his placement on leave, Carnes had the opportunity to return to work, provided that he obtained a fit-for-duty slip. Yet Carnes never submitted to the ongoing psychological and psychiatric treatment that Dr. Ferri recommended. Likewise, Carnes declined to attend a meeting with Ackerman to discuss his return to work. Finally, Carnes never filed a grievance (as the CBA entitled him to do) challenging his initial or continued placement on leave. (Doc. 25 at 47–50).

On these facts, a reasonable jury could conclude only that the defendants afforded Carnes due process of law.[2]

### b. Liberty Interest

"[A] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment." *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989).

"However, defamation alone is not enough to invoke due process concerns." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002). Instead, "[s]ome alteration of a right or status previously recognized by state law, such as employment, must accompany the damage to reputation." *Id.* (internal quotation marks omitted). This is the so-called "stigma plus" test that derives from *Paul v. Davis*, 424 U.S. 693 (1976).

The Sixth Circuit applies a five-factor test to determine whether a plaintiff has made out a "stigma plus" claim:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. ... Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. ...Third, the stigmatizing statements or charges must be made public. ... Fourth, the plaintiff must claim that the charges made against him were false. ... Lastly, the public dissemination must have been voluntary.

*Quinn*, *supra*, 293 F.3d at 320.

Carnes has failed to show that there is a genuine factual dispute as to his liberty-interest claim. For one thing, Carnes's opposition brief does not even address this claim, and I therefore find

---

[2] Because Carnes has not shown that there is a genuine factual dispute as to his due-process claims, I do not address defendants' argument that Carnes must prove that his state-law remedies were inadequate. (Doc. 22 at 21–23).

12

that Carnes has "abandoned this claim and waived any argument concerning dismissal of such claim." *IUE-CWA v. Gen. Elec. Co.*, 2017 WL 3219728, *12 (N.D. Ohio).

For another, Carnes offers no evidence to support several elements of his claim. He cites no evidence that Ackerman or any other school-district employee made defamatory statements or disseminated such statements publicly. Nor has he produced evidence showing that such statements were false or that they "effectively foreclose[d] the opportunity to practice [his] chosen profession." *Parrino v. Sebelius*, 155 F. Supp. 3d 714, 722 (W.D. Ky. 2015). To the contrary, Ackerman advised Carnes that he *could* return to work once he had resolved his mental-health issues and obtained a fit-for-duty slip.

Carnes's liberty-interest claim therefore fails as a matter of law.

### 2. First Amendment Retaliation

To state a First Amendment retaliation claim, a plaintiff must establish: "(1) [he] engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connections between elements one and two – that is, the adverse action was motivated at least in part by [his] protected conduct." *Maben v. Thelen*, --- F.3d ----, 2018 WL 1599335, *5 (6th Cir.).

But "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*

Carnes's First Amendment claim fails for the same reason as his state-law retaliation claim. The school district placed Carnes on leave because of its genuine concern for the state of his mental health, and the danger to school employees and students that Carnes thus posed. Two mental-health professionals concurred that Carnes was not fit for duty, and a state court found that it was

appropriate to enter an order of protection against Carnes. The uncontradicted evidence shows that defendants would have placed Carnes on leave regardless of whether he had engaged in any constitutionally protected activity.

## Conclusion

It is, therefore,

ORDERED THAT defendants' motion for summary judgment (Doc. 22) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge